We are now ready to hear argument in our first set of cases. Mr. Beegin. Thank you, Your Honor. May it please the Court, my name is Dan Beegin and I have the pleasure of representing Enterprise Leasing Company, Southeast LLC Enterprise in Appeal 12-1514. My portion of the argument will be limited to the labor issues presented under the NLRA in that particular matter. The labor issue presented is simply whether Enterprise did or did not violate Section 885 of the Act by refusing to recognize and bargain with the union, Local 391 of the Teamsters. Certainly, I recognize that a significant constitutional issue is presented in this case and my partner, John Hoffman, will address that issue later. At the same time, it is an established principle of constitutional adjudication that courts will not pass upon a constitutional issue if there also is some other ground upon which the case may be disposed of. We believe that Enterprise is entitled to relief on the basis of non-constitutional issues and that the Board's April 18, 2012 decision and order should not be enforced as requested. Given that, at the end of the day, it is the position of Enterprise that in Case 12-1514 the Court need not address the constitutional issue. Because this is a technical refusal to bargain proceeding, some aspects of the underlying NLRB representation case must be reviewed. The Teamsters filed a petition in November of 2010 and an election supervised by the NLRB was conducted on December 16th and 17th of 2010. The results revealed a razor-thin majority in favor of the union. There were 44 votes in favor of union representation, there were 41 votes against union representation, and two challenge ballots which were not open. Not only was the margin razor-thin, but 12 eligible voters failed to cast a ballot, a critical fact given one of the objections which I will discuss later. Enterprise timely filed objections to the election. A hearing was conducted before a hearing officer of the NLRB, an officer who, by the way, resided in Grand Rapids, Michigan. The hearing officer then issued his recommendations. We filed timely exceptions and a three-member panel of the Board on December 29th of 2011 issued a decision and certification of representative in which Board Member Hayes dissented. Board Member Hayes would have upheld employer objection number four and directed a rerun election. To obtain a review of that representation proceeding, Enterprise refused a bargain, setting up this technical refusal to bargain case. We moved to disqualify Board Members because of the presidential recess appointment issue. That motion was denied, the Board granted summary judgment, and filed this application for enforcement which is pending before this court. It is our position that Board's application should be denied based on the post-election objections of Enterprise. And there are three objections which I would like to quickly address. Objection number one involved the threat of union organizer director Stephen Jones. In objection number one, Enterprise asserted that Mr. Jones threatened an eligible voter on the day of the election in the presence of another eligible voter. How do we assess the Board's characterization of that, as you call it, a threat? They say it was not. It seems to me that that's a factual issue, and if so, isn't the Board entitled to a substantial amount of deference as to how that was characterized? They are entitled to a certain amount of deference, John, but critically, when I looked at the hearing officer's report and recommendations, here's what he concluded. He found that the organizing director in fact told an employee, an eligible voter, in the presence of another voter, quote, not to burn his bridges because you may need me in the future. Well, that's part of what he said. I think the other part was he handed him his card and then made the rest of that statement. I think we need to take the entire statement in context, as the Board apparently did. The hearing officer also noted, Your Honor, that such a statement could be fairly characterized as a threat to withhold assistance from an eligible voter in the future. I believe there are multiple cases that we cited in our brief that stand for the proposition that the threat of a union to tell a member or a worker that they would not represent them is in fact violative of the NLRA. Board precedent cited in our brief also stands for the proposition that a party committing such a violation during the critical period, that is the time between the filing of the petition and the election, and this was shortly before the election polls opened, engages in objectionable conduct warranting a new election. This Court has adopted the same view, and I think it's very important and goes to the importance of this issue that it happened immediately before the election, it happened in the presence of another employee, and it was clearly designed to influence the vote of that individual. Does the fact that it happened immediately before the election somewhat dilute the impact as to other voters? I suppose there's an argument certainly that, as you put it, it may have had a direct impact on this voter, who apparently was against the union in any event, but given the short time frame, how realistic was it to expect that it had an impact, if any, beyond this one person? In all candor, Your Honor, the hearing officer clearly indicated that he didn't think there was good evidence of dissemination, but we never know how an individual is going to vote until they actually vote, and even then we don't know how they're actually going to vote. The reason we have secret ballot elections supervised by the NLRB is to make sure that the employee has a secret ballot election, that employee can exercise his or her rights to vote for or against the union at that time, and they can make that decision at that time even if they have previously expressed some support of one party or the other. And that's one of the most important things we do as a board agent, or I did as a former board agent, make sure that the employee has the opportunity to express his will without coercion. So in any event, we believe that that was a threat, there was another employee present, and we believe based on that threat the election should have been overturned. Perhaps more importantly, Member Hayes disagreed with the board majority on employer objection number four. Employer objection number four, it was alleged that the union improperly utilized the image of an eligible voter without his consent. Salient facts are very clear, and frankly these are all facts that the hearing officer found. The union used the photos of approximately eight employees in a campaign circular. The crux of your objection on this point is that the board applied the standard used in evaluating misrepresentation. That's very interesting, Your Honor, and you're absolutely right. The board did use a misrepresentation analysis. And what was wrong with that in your view? From our view, the error in doing that, and it was outlined by Member Hayes in his decision, is that both the employers and unions are subject to the same standards in election campaigns. In this particular instance, there's a case right on point, Allegheny-Ludlam, in which the board said for an employer to utilize the photo of an employee in a campaign propaganda manner, they have to get the consent of that employee. The facts are undisputed in this particular case. The union had a policy of obtaining consent from employees prior to utilizing their photos. The evidence is undisputed that they did not get the consent of this particular employee. Did this particular employee object to the use of his photograph? In all candor, Your Honor, that employee was not called as a witness, but that's not the issue. There was nothing in the record to indicate that there was an objection by that employee, was there? That's correct. But in Allegheny-Ludlam, the board at 333 NRV 740 expressly says that the Section 7 right necessarily protects an employee's right to choose the degree. As I recall, though, in Allegheny-Ludlam, there was no discussion of the standard. It found, as you said, but it didn't discuss whether or not the middling standard applied or not. Am I not remembering that correctly? You're reading that correctly. That did not address the misrepresentation. And frankly, our view of that objection always was that it's not a misrepresentation issue. It's an issue as to whether that employee's Section 7 rights were breached. Allegheny-Ludlam clearly illustrates they were. The board in subsequent cases in which the union has not obtained consent from an employee to utilize their photograph has overruled objections while they didn't directly say that a union has to give that consent. That was certainly the implication in Spring Manor and in Somerset Valley rehabilitation. I know I'm getting very short on my time, and I apologize. I didn't get to address objection number six, which is inclement weather. But I would note that the appropriate remedy in this particular case is not remand. The NLRB has asked for enforcement of its order in full. They did not seek remand as an alternative remedy. I'm sorry to interrupt you, but with respect to inclement weather, didn't RDU maintain normal operating hours? The airport was never closed, was it? Could you repeat the question, Your Honor? The RDU maintained normal business hours. It was not closed. Is that correct? It was not closed because of services at airports and people coming on flights. They had to remain open during the course of that. What evidence is there in the record that demonstrated that the evidence was presented in the record to demonstrate that these eligible employees were not able to vote because of inclement weather? That's not the standard the Board has established in the Gostown case, Your Honor. You might want to answer the question, though. I apologize, Your Honor. There was no direct evidence as to why particular individuals did not vote. Frankly, we don't know who does not vote because it's a secret ballot election. We don't know who failed to vote. We just know if a determinative number voted. It's just speculation, then. It's not speculation under the Board's standard that a determinative number of people did not vote. It's not speculation that there was inclement weather. Even if they chose not to vote? In Gostown, the Labor Board addressed that particular issue, Your Honor. The hearing officer in Gostown addressed why certain people didn't vote. They addressed why certain people elected not to vote. They didn't want to be part of the process. They made that decision. The Board, in the Gostown case, expressly said, we're not going to go into those subjective inquiries as to why somebody did or did not vote. That's inappropriate. The standard is, was there inclement weather? And if there was inclement weather, did a determinative number not vote? Twelve did not vote. That is the standard. And we aren't supposed to, under Gostown, engage in a subjective inquiry as to why people did or did not vote. How do you define, I mean, what's the standard for defining inclement weather? Are we now going to be required to have Board members who are meteorologists? I don't think we require the Board members to be meteorologists. I think that would be an unfair standard, and I think your inquiry is correct on that. But certainly we know from that date, Your Honor, we had newspaper reports that three people were killed on roads because of the icy conditions. We also had the North Carolina Department of Transportation on the second day of the election urging people not to go on the roads unless they absolutely had to. We also have seen examples recently where, because of inclement weather, various courts, and we did this in a 28-J supplemental letter, have opened late because of inclement weather they faced. And the purpose of a Board election is to provide employees the greatest opportunity to exercise their Section 7 rights to come in and vote. That didn't occur on this particular day because of the weather and because we know the determinants of number did not vote. Did your client object in advance to holding the election because of the inclement weather? As the hearing officer reported in his report, neither party objected to conducting the election. Doesn't that suggest a little bit of sandbagging to see how the results turn out and then waving the flag of inclement weather? I don't think it was sandbagging at all. I think everyone was hoping that all employees would be able to exercise their right to vote and come in and not have this particular issue arise. And if I may, Your Honor, the parties typically put in great efforts before an election. We know we involve the government. It's very complicated to set these up. We want to run them on a timely basis as best we can. We're not blaming the union, the employer, or the Board. Obviously, it was something beyond everyone's control. Thank you very much. Thank you very much. Mr. Robertson? Thank you, Your Honor. My name is Greg Robertson. I'm here on behalf of Huntington Ingalls also to argue the labor law issue of the case. My partner, Mike Chabelski, will argue the constitutional aspects of the case. Could you pull the mic a little closer to you, sir? Yes, sir, Your Honor. Thank you. This case also comes to the Court on a technical refusal to bargain, in this case to challenge the Board's decision as to the appropriate unit found for the election. In this case, the NLRB found that a few, but by no means all, of Huntington's technical employees should be included in what they deemed to be an appropriate bargaining unit. In doing that, the Board surprised my client and blatantly disregarded at least two decisions of this Court. And here, the Board didn't change the rules in the middle of the game. It changed the rules two years after the record in this case was closed. In deciding the case, the Board adopted and applied standards in this case that violate Section 9B and 9C.5 of the Labor Act, attempted an end run around this Court's decision in the Lundy Packing case, dramatically changed the law as to how it decided bargaining unit issues, tossed out over 50 years of Board law as to how it decided bargaining unit issues with respect to technical employees, attempted to distinguish two Westinghouse cases that it had decided which were directly on point, involving employees doing the exact same work, and implemented a new policy which facilitates the creation of multiple small bargaining units,  The Lundy case is absolutely remarkably similar to this case in almost every way. It involves the Board looking solely at the unit that the union proposed. The Regional Director tossed in a couple of extra job classifications. The Board used its overwhelming community of interest standards to decide the case. It changed its policies and its standards without notice and without explanation in violation of folding box. What are we to make of the fact that the union initially sought to organize a group of only 121 individuals and the hearing officer rejected that and directed the unit to include other technical employees? Doesn't it at least give the impression that the hearing officer recognized and appreciated the flexibility that the employer sought? Well, Your Honor, I actually don't think you should make any of it. The Lundy court made none of it and the same thing happened there. And the reason is, one, that all happened two years before the specialty decision, which was the law the Board applied to this case even was issued. Two, the union consented to it. The hearing officer asked the union and the union consented. Three, while the Board in its briefs in this case takes credit for the Board having done that under its specialty analysis, it didn't do it. It was done two years before the analysis which was applied to this case in the specialty decision was even issued. So the unit that the Board got was a unit agreed to by the union. It was a unit that was already passed on. It was already done. There was no addition by the Labor Board here, and that's exactly what happened in Lundy. And in the Lundy court, the court focused on the issue of who was excluded, not who was included. And finally, the union never challenged any of that. And as Judge Wilkinson said in Lundy, that's the critical point. They never challenged it. So the issue in front of us is the Board is the unit that we were presented with. I thought the problem in Lundy was the fact that the Board applied a presumption to the union's favored number of employees for a collective bargaining unit. I don't know that we have the same issue in this case, do we? Your Honor, you virtually do. The problem found by Judge Wilkinson in Lundy was twofold. One, it was the Board's myopic focus only on the unit requested by the union. And then secondly, applying a test, this overwhelming community of interest test, which the Board decided was virtually insurmountable. And the problem in the first part is this, and it's the same thing that occurs in this specialty analysis. It looks only at the unit sought by the union, all right? And it doesn't look at anything else. The Board tells you that it's fixed the Lundy problem, this presumption problem that you referred to, by applying two intermediate questions, which are one, is the group the union sought an identifiable group? And two, does it have a community of interest within itself? Any job title meets those standards. Almost any group is an identifiable group, and if it's an identifiable group, it has a community of interest. What Judge Wilkinson said in Lundy is the problem here is when you only look at the unit that the union has supplied, and you know that the unit that the union asked for is one that it has organized, then by necessity, the Labor Board is only focusing on the unit that the union has organized. And that allows the controlling factor to be what the union has organized. So what do you say the Board should have done? The Board should not have applied – should not have adopted or applied specialty because that's unlawful. I understand it, though. That was applied as an alternative holding. Frankly, we could ignore it because the Board went to its traditional test and applied it. You may disagree with that. I guess what I'm asking you is, as a procedural matter, how should the bargaining unit in your analysis have been determined or at least considered in the first instance? It should have been considered as the 50 years of technical law says, and that is that all the technicals are presumed to be included in the unit, and it was up to the union to meet a burden of proof to show that there was a sufficiently distinct group. But the Labor Board in this case, Your Honor, what they said was, as to the specialty case, is that the Board's recent decision in specialty sets forth the principles that apply in this type of case. So that's the law they applied here, and that's the law they are telling us now applies to technical cases. That's why I'm arguing that specialty – I appreciate that, but then they went on and applied PRW-CAR, and you may disagree with that analysis. But if we agree with the Board, doesn't that insulate this decision from any issues that might arise as a result of the Board's analysis of this specialty health care case? Your Honor, I understand the question, and I respectfully would disagree with that analysis. One, because, again, the Board did tell everyone that the law now, and the law in this case is specialty, not TRW. Two, I think the analysis under the TRW case was virtually a foregone conclusion. It was the Board trying to have it both ways. There was no way for the Board to overturn the regional director's decision and remain faithful to its specialty decision. The two are mutually inconsistent. Yes, ma'am. No, please finish your sentence. I was going to say, to defer in any way to the TRW analysis, which I would contend is dictative, given its decision that specialty is the law of the case, I think would be in error. And in any event, it's not supported by substantial evidence, and I'm prepared to discuss that as well. The reason for my earlier question about the tweaking of the bargaining unit by the hearing officer is that it seems to me at least arguable that it indicates, it evidences that independent assessment that the Board has spoken to to address the presumption in Lundy. So the hearing officer and the Board conduct an independent assessment of the union-proposed unit. And here, I don't see how we can factor that out of our analysis simply by virtue of the fact that the union later acquiesced to it. It was still an independent analysis that mutes any presumption that may have occurred in the first instance, if you understand that very long question. No, yes, I do, Your Honor. I don't think, but I don't, I would respectfully disagree. Remember that the union didn't acquiesce after the regional director made a decision. The union acquiesced when it was asked by the hearing officer would it agree that these two additional job classifications. Why does that matter? Well, because once the union said, okay, we agree that the unit is now X, that's the unit that then proceeded. There was no adjudication by the Labor Board under its specialty standard about whether X should include more or less. It accepted X as the bargaining unit, and it applied a test that only looked at X, that the union had said that's the unit we're willing to go with. And if that's the case, if you only look at the unit that the union proposes, and you know, as Judge Wilkinson found, that the union is going to propose a unit that is organized, then by necessity the extent of organization is what's going to control. And if the only way you can add to X is by an insurmountable test, this overwhelming community of interest test, which is a test, by the way, that's used by the Labor Board to deny people the right to vote under this statute, if that's the test that you're going to use, you're never going to add to X. And so the union's extent of organization is what's going to control. That's exactly what Judge Wilkinson found in Lundy, which is what's applied here. The other thing I would say is that their specialty standard is brand new. It's brand new as to technicals, and it's brand new as to other bargaining units as well. And at least as to technicals, under Virginia Folding Box, this court requires them if they're going to make a change like that, they have to explain it, and they didn't do it. It's a change because under historical law, the board has said even just a year and a half to two years ago that we never in isolation look at the unit proposed by the union to decide whether or not it has a community of interest. Rather, as Judge Wilkinson said in Lundy, the way they get around the 9C5 problem is the board takes the unit proposed by the union, the employees, the employer seeks to add, and looks then at the community of interest test. That's how it gets around 9C5. If you only look at what the union gives you, you never get to that. And that's the problem here. That's why it still violates Lundy and 9C5, and that's why it's also a change. Remember that in the technical barring units, and that's what we have here, 50 years' worth of law says that all technicals should be included and that the burden of proof is on the union. The change here is now that that presumption of all technicals being included has been dropped without explanation, and the burden has been moved from the union to the employer to meet the overwhelming community of interest test. That's a huge change. It's a huge change that required an explanation, and it's one that it didn't get. Now, to turn to Your Honor's point about the TRW analysis, there are two major problems with that. The first is that the board basically went against two Westinghouse decisions involving employees doing the same thing. How do we know that? Because there was a witness that testified that worked both at Westinghouse and at Huntington as an RCT. His name was Doug Wolkovich. His testimony was that he did exactly the same thing as an RCT at Westinghouse as he did at Huntington. The board nor the regional director ever mentioned his testimony, and the Westinghouse case was exactly like this case. It involved RCTs, and the regional director in Westinghouse found that the RCT job was, quote, and said, no, what they do is they enable everybody else to do their jobs. That's what the RCTs do here, and yet the board reached an opposite conclusion. The board also found, mistakenly, I think, that the RCTs job was not functionally integrated with what everybody else did. In fact, they said it conflicts. In fact, they said it wasn't part of the production process that our technicals went through. Those are amazing conclusions when you keep in mind that Huntington is in the business of nuclear shipbuilding and refurbishing, nuclear submarines, nuclear aircraft carriers. The ships don't run without nuclear power. What these people do, these RCTs do, is they adopt and they implement the nuclear safety program. They meet with everybody going in and out of the ship's power station, and there are literally thousands of people that do that. They enable everybody else to do what they do. They talk with them. They meet with them. They monitor them. They're sometimes in there with them. They sometimes stop production when necessary, just like a quality inspector might stop production when necessary. It's not in conflict, Your Honor. I mean, it's an amazing statement when you think about it, that the labor board is going to tell you that people who are responsible for job safety are somehow not an integral part of performing the job, particularly when you talk about the kind of business we're talking about and particularly when you have precedent right on point that says just the opposite. And that's where we are here. And to say that they're not part of a, quote, production function like other technicals, look, what other technicals do is they engineer, they test, they draw. Well, they don't actually engage in production either. What they do is they facilitate production. Well, that's exactly what these RCTs do. They facilitate production. There is no difference in what they do than in others. And the testimony of Wojtowicz and Glenn Morgan and others will tell you just that. And finally, one other point. The labor law policy in this country is turned on its head if you allow this specialty standard to apply. And a national defense contractor like ours who has hundreds of job titles, that literally opens the door to hundreds of bargaining units, hundreds of sets of collective bargaining negotiations, and everything that entails. That's not what Congress intended. Thank you very much, Mr. Robertson. You have some time for rebuttal. Thank you. Mr. Schabelsky. Thank you, Your Honors. My name is Mike Schabelsky on behalf of Huntington Ingalls to address the recess appointment issues. One thing both sides agree on, Your Honors, is that the challenged appointments here were intra-session appointments. Another thing both sides agree here is that these appointments would be invalid and unconstitutional if the recess appointments clause does not allow intra-session appointments. In other words, there is no savings clause or safe harbor or other statutory hook to validate these appointments, notwithstanding the constitutional infirmity posed under the clause. Now, the Court has been presented with three possible interpretations of the recess appointments clause as it applies to the recess question. One interpretation, the one we think is correct and there's no canning sound, is that the clause is limited to breaks between sessions of Congress. Another interpretation, the second one, is that the clause extends to all adjournments of the Senate, including all intra-session adjournments. The third position, the one advocated by the Board, is that the clause extends to some, but not all, adjournments during the Senate session. Who makes the determination as to whether the Senate is in recess or in adjournment? The Senate does, Your Honor. The Constitution provides the Senate, as well as the House, with the authority to determine its rules of practice. The one body that should not be wading into this thicket would be the courts. Under the Board's interpretation, they would have the courts engaged in endless debates, applying murky standards to every single session of Congress to decide whether, under some vague standard of general, truly availability, whether the Senate is in session or not. It's a separation of powers question, is it not? It is absolutely a separation of powers question, Your Honor, and the Supreme Court has made clear that the Constitution compels bright lines and clear tests on separation of powers issues precisely to give clear guidance to the courts and to the public about where constitutional lines are drawn in this area. Now, Your Honors, nobody is advocating that second interpretation, that the clause extends to all adjournments during every Senate session. So we're left with the debate between the one that limits it to intercession or some but not all. Well, Your Honor, the touchstone to decide this issue is what was the framers' intent? It is not a question of saying what is expedient now for the President,  the answer has to be determined and answered solely by what did the framers' intent. And wasn't that intent that the framers wanted the President to be able to fill vacancies when the Senate could not act? And if that's the case, what does it matter that the Senate is unavailable to act as a result of an intercession recess of an extended period of time as compared to one that occurs between sessions of Congress? Your Honor, because I disagree with your premise. The Constitution, the appointment clause and the recess appointment exception to it does not talk in terms of the Senate being unable to act. The governing mode, the norm mode, as the Federalist Paper says, is to have the joint appointment between the President. That's a presumption. I agree with that. And not just a presumption. That was the result of very heated debate. And the recess appointment clause applies only when the Senate is in the recess. It wasn't when the Senate is unavailable to act. And as that phrase has been consistently understood through at least the first 150 years of our nation, was that the application of the recess appointment clause applied only during the intercession breaks. Let me ask this then. So under your interpretation of the recess power, Congress can take all manner of extended intercession recesses, months at a time, and whittle down the intercession recesses to a virtually nonexistent period of time. And under your theory of the case, the President would be powerless to appoint officials that may well be needed for the proper operation of the government during those extended intercession recesses. Is that your view of the case? No, Your Honor, because in that extreme situation, which has never happened, hasn't even happened with this Congress at issue here, this Congress has made tens of thousands of appointments. So we never have confronted the situation of that extreme breakdown and responsibility among the Senate. But if that were to happen in that implausible event, which shouldn't drive our interpretations of the Constitution, the Constitution does have a means for the President to summon the Senate back in session. And ultimately, Your Honor, what I think your question goes to is that the framers gave the Senate the power to say no. Giving the Senators the power to say no means they can exercise that power. We shouldn't think it is wrong. We shouldn't think it is weird. We shouldn't think it's a breakdown in the constitutional system if the Senators want to say no. They could be in session, even under the board standard, 365 days a year and refuse to appoint anyone. That would be constitutionally permissible. What the framers intended was to have this check and balance, and the political branches have to come to accommodation, as they have done for 200 years, as they continue to do now. And that interpretation is the only one that makes sense with the constitutional text. The Recess Appointment Clause uses the term the recess rather than the term adjournment or adjourn that is used elsewhere in the Constitution. The Supreme Court has made very clear that that difference in language in the Constitution cannot be assumed to have been a mistake. It has to be intentional. The Constitution also uses the term the session, and clearly Congress meets in more than one session, so why do we ascribe such a definitive meaning to the recess in this context as opposed to others? Well, because, Your Honor, the question here is not whether the phrase the recess means one particular intercession break. It applies to all intercession breaks between all sessions of all Congresses.  In the Constitution, meant to refer generically to any adjournment in Senate sessions, they use the verb adjourn or the noun adjournment. In this particular application, though, they use the term the recess. Twinned with the word session. Clearly showing both, they meant something other than the generic reference to adjournment. They mean some sort of subclass. And by twinning it with session, clearly they're contrasting either you're in session or the recess. That is the distinction that's being drawn. Also, this interpretation is the only one, in contrast to the board's, that avoids inconsistent results. Under the board's interpretation, you're going to have some recess appointments that only last one session of Congress, and others, if made intercession, could last upwards of two sessions of Congress. There's nothing in the text or structure of the Constitution that suggests the framers intended that odd result. And, of course, the intercession interpretation is the one that gives force and vitality to the system of checks and balances, which is, of course, the hallmark of the Constitution and, as the framers recognized, the ultimate reservoir of our individual liberties. The intercession interpretation... Mr. Schabelsky, your red light has been on. Oh, I'm sorry, Your Honor. Thank you. Mr. Hosman? Yes, Your Honor. May it please the Court, my name is John Hosman. I'm counsel for Enterprise Leasing, and I will be also addressing the recess appointment issue. The issue arises because if the appointments were not valid, then the board lacked a quorum when it issued the order that it is here today seeking to enforce in the Enterprise case. Let me ask you one question, which I don't think the record reflects. Mr. Terrence Flynn was nominated to the board in January of 2011. Is that correct? Mr. Flynn, I don't recall the exact date of his nomination. My question is, is there anything in the record to show why he was not confirmed and he was the subject of a recess appointment in 2012? I do not know why he was not confirmed. And I know that he subsequently resigned. He did. All right, thank you, sir. And that brings me to a good point. The underlying R case decision, which my colleague Mr. Beejan addressed, was issued by the board on December 29, 2011, with members Pierce, Hayes, and Becker participating. Then on April 18, 2012, the board issued the order it's here today seeking enforcement of and board members Griffin, Block, and Flynn, or Pierce, Hayes, and Griffin, participated in that decision. And it was member Griffin whose appointment is subject to the review here today. Enterprise timely filed a motion to disqualify those board members, and as Mr. Beejan said, that motion was denied by the board. And we've maintained that position throughout the proceedings that those appointments were invalid. As my colleague, Mr. Chbilewski, stated, obviously the preferred method, and the court recognized, is that the President nominate individuals and the Senate has the right to consent to those nominations. That I think even the government would recognize is the preferred way that this should happen. Only when the Senate chooses to recess, sign API, do they acquiesce in giving the President the authority to then make appointments to vacancies that happen during that recess. It is up to the Senate to decide if they want to request that authority upon the President. He does not have it unless the Senate does take that recess. There are many other points that I think even the government would concede and all parties agree to. One, in-trust session recesses were extremely rare up until very recently. They did not exist at the time this clause was first drafted by the framers, and it was not something that came up. Secondly, everybody agrees that when the Senate does adjourn, the President does have the ability to fill up those vacancies. Where the government disagrees with us is what vacancies they're able to fill up. It is our position and the position of the court in Noel Canning that it is only those vacancies that happen during that recess. The government is asking you to apply an interpretation that it is all vacancies that exist at the time of that recess, whether they existed for months or years prior to that recess. Your view of that clause, though, read too literally, would suggest that the President could fill up vacancies that happened during the recess or a recess at any time, whether the Senate was in session or not, since otherwise you'd have to read during the recess twice in that clause to get to that limitation that you proposed. And I understand that's also the position of the government, Your Honor. I don't believe that that's the interpretation when it's read in conjunction with the understanding that the normal way this should happen is that the President should nominate individuals, and the Senate shall have the right to consent or withhold their consent. So when they're in session and there's a vacancy, I think everybody agrees that the President's obligation is to submit a nomination and provide the Senate that opportunity to either consent or, more importantly, decide to withhold their consent. And how long the Senate takes to consider that nomination, investigate whether they think that person is qualified or not, is entirely within the province of the Senate themselves. Under the government's interpretation, the President can sit on vacancies, and often in our modern society, given the scope and size of the government today and the number of vacancies and seats that have to be filled through nomination and consent, often seats do sit vacant for months or years. And then all of a sudden, as in the case of these appointments, where seats did sit vacant for months at a time, a nomination can be submitted two weeks prior to a break, and the government hasn't really told us what size of a break they think is necessary, whether that's three days, ten, or twenty. But after sitting on a vacancy for months at a time, he can then seize upon the first absence of the Senate from the chamber and put somebody in there. Now the needs of the government... The whole center of that argument generally is a presumption that somehow the President is inclined to act unconstitutionally at the first instance or opportunity. Why should the court engage in that kind of, or accept that presumption? I mean, shouldn't we assume that everybody in our branches, all three branches of government, are acting in good faith, and that the President, at least with respect to this recess, Carl, which is in fact an executive power that apparently should have some meaning, that we should grant him a level of good faith when he makes, he or she, decides to make these appointments? We absolutely should, Your Honor, and we should give the Senate the same level of respect when it decides not to act on a particular nomination. And it only becomes an issue because the government has raised the idea that there will be this great power vacuum if the President does not have this authority to decide when a recess is in place and to decide that the nation needs to have somebody put in that position. Isn't that what happened here with respect to the board? They fell below a quorum and couldn't act. Right, and with respect to the board in this case, the vacancy existed for almost a year prior to the President submitting the nomination. And so this was not something that came upon everybody as a surprise. And in particular with the NLRB, each board member... The board was below a quorum for a year before the President nominated? I don't think that's correct. No, there were vacancies on the board. Okay, well, I mean, the board was able to act. I mean, it wasn't that the President had to make an immediate appointment or face the prospect of no action on the part of the board. It was then, when the Supreme Court ruled that this wasn't a sufficient quorum, that the President felt compelled to act. You're right, Your Honor. The difference here is that the President knew when these appointments were going to expire. It was not a surprise to the executive that these vacancies were going to happen or arise. He knew well in advance and had not submitted the nominations until just shortly before actually using what he believed to be the recess appointment power that we believe he did not have at the time he did that. And, in fact, the board is structured in a way so that this should never happen. Of the five-member board, and they need to act as a three-member panel to have a quorum, each board member's term is set to expire in a different year, so that even if one person's term expires without somebody confirmed to take their place, there should always be four sitting board members. Is it your understanding that there is a particular presumption regarding the presidency of lawfulness of action? I was interested in the notion that certainly we would presume that government officials, as you indicate, act lawfully, but I was interested in the Eleventh Circuit's notion that we accord some particular presumption to the actions of the President. Are you familiar with such a doctrine?  And I would not think it would apply to this situation. Thank you very much. Ms. Brinkman? May it please the Court, Beth Brinkman from the Department of Justice on behalf of the National Labor Relations Board. I'm here with my colleagues from the board, David Seid and Bob Englehart. I'll be addressing the constitutional issues, and then they'll be addressing the labor issues. The Court should reject the constitutional challenges to the Recess Appointments Clause here because they are contrary to the text, history, and purpose of the clause. Indeed, the employers only raised two of these challenges belatedly in their reply brief and have in fact waived those arguments, the happen and the inter-argument. The Court need not reach them. They're not jurisdictional, and we've addressed those in our briefs. I'd like to spend my time today addressing the merits of those constitutional ones because those are much more complex issues I think that are worth the time of oral argument. And I'd appreciate it if you would start with the text. Certainly. If that comports with your... Absolutely. That really takes us to the first timely challenge that the employers raised, and that would suggest that there was no... No, this is just my question. Yes, I was addressing what the term recess means and whether or not there was a recess in January 12 when these appointments were made. And we look to the common understanding of that term and indeed the joint understanding of both the Senate and the President as to what that means, and it means a suspension of business. I thought you were going to begin with the text of the Recess Appointment Clause. The text goes to all three arguments. Perhaps you're talking about the the and the singular that goes to the intra. It talks about giving the President the ability to fill up vacancies during the recess. If we turn to the challenge of whether or not the President has authority to make appointments during intra-session recesses, the Noel Canning Court focused on the term the, but we believe the 11th Circuit that disagreed with that had the better half of that to explain that the word the can refer to generic, not just a specific that the pen is mightier than the sword is our best example of that. Well, it can, but I guess the question is, is that what the framers intended? Isn't that what we need to figure out? Yes, and we think that it is. The fact that we have two plausible interpretations doesn't really matter if the framers really intended, expressly intended, to limit this recess power to inter-session recesses, and that's what we're trying to figure out. Right, and there is no basis in the text for that decision. The employers are trying to take that and make a limitation that nowhere limits the word the recess to inter-session recesses. What about the practical matter that inter-session recesses were virtually nonexistent during the time of the framing and shortly after when the first Congress convened simply because of the matter of reality? They couldn't afford, Congress couldn't take inter-session recesses. The more logical time to break was between sessions of Congress. Your Honor, we'd like to, I think, go through in our brief. We set forth at least a half a dozen different contemporaneous examples from the time of the framing. I think it goes to the understanding of that language. The Articles of Confederation used the term the recess and talked about the Committee of the States, the only time during which that committee was during an inter-session recess. We have the various state constitutions, two of them, Pennsylvania and Vermont, referred to trade embargoes during the recess. We have evidence that those included inter-session recesses. We have the New York Constitution, talked about a Committee of Safety operating during the recess. Again, that included inter-session recesses. We have another provision in the Constitution itself, the Senate Vacancy Clause, which provided how governors could fill vacancies in the Senate. That referred to the recess. It would be helpful, I think, perhaps if I frame it this way. If we accept your interpretation that the recess does not refer to the inter-session recess, then what are our parameters for determining what inter-session recesses are appropriate intervals for presidential appointments? Okay. We would urge you not to. I will address the question. I think what you would have to look at then, it would change the premise on which the Constitution has been interpreted, more than 400 appointments, for example. So we would have to step back and look to see what that inter-session recess then meant. I'm not sure that I'm being clear, and I apologize for that. I agree with you for purposes of my question that the recess, as referred to in the Recess Appointments Clause, does not refer solely to the session between sessions. I accept that for purposes of my question. What then is your proposal for guidance as to what is an inter-session recess that supports a recess appointment? Because I understand your argument to be that not all of them do. That is a shared understanding of both the Senate what a recess means, and we know it means a suspension of business. And here, for example, Your Honor, the Senate – Any suspension of business? No, we look to what the Senate and the President have looked at for 100 years, the Senate report from 1905, the Attorney General's opinion from 1921. They look at what a suspension of business means for purposes of the Recess Appointments Clause, not a de minimis lunch break or bathroom break, but things where the factors are no duty of attendance. Senators don't need to be there. The chamber is empty. No messages are laid before the President, for example, all of which occurred during this 20-day period from January 3rd to January 12th. And going to Judge Hamilton's question about who gets to decide this question, Your Honor, as a threshold matter, we suggest there is some deference to the President because it's an enumerated power of the President. I don't think that would be supported by the separation of powers doctrine. Well, here there's no disagreement. That's the part of this case, Your Honor, because we take the Senate at the word here. When they set out this period, they said no business would be conducted. And on that same day, in orders of the Senate, as they ordered their business for that period, they referred to it at the recess. Let me say what the Senate itself said. They were operating pursuant to a unanimous consent agreement which provided that the Senate would meet in pro forma sessions every three business days from December 20, 2011 through January 23, 2012. The agreement stated that, quote, no business would be conducted, end quote, during these sessions. During the December 23 pro forma session, the Senate overrode its prior agreement by unanimous consent and passed a temporary extension to the payroll tax. During the January 3 pro forma session, the Senate acted to convene the second session of the 112th Congress and to fulfill its constitutional duty to meet on January 3. Now, can you tell me that that meant that the Senate was in recess? Yes, Your Honor. By their own terms? Yes, Your Honor, because during that order, it said during this period we will not be conducting any business. And on that same date, on that same date in the congressional record, Your Honor, it makes clear the next time they are going to consider a nomination is January 3. They specify that. They also provide for appointment of officials within the legislature during that period of time. They refer to it at that period as the recess. For purposes of the recess appointments clause, we look to, based on the Senate's understanding from their 1905 Senate report, from the President's, the Attorney General opinion, the perspective from 1921, this was the design that was set up by the framers in the Constitution. The Senate can choose to be in recess and available to provide advice and consent. But despite that understanding, they did conduct business. And that leads back to my question and my concern. There would appear to be from this colloquy that whether or not an intra-session break supports a recess appointment can be the subject of dispute. But, Your Honor, it's been there for 100 years. In 90 years there's been this. It's like looking for a problem, looking for a solution to a problem that does not exist. And I have to agree. I would refer you back to the discussion that took place. There does appear to be some play in those joints. That's my only point. And I was just asking, you believe apparently that it is subject to precise calculation. And I do wonder if that's the case. And if not, if that causes concern. I think here, Your Honor, we have a period of no business being conducted, including the Senate specifically providing they will not. But they did conduct business on December 23rd, did they not? No. In the 20-day period from the convening of the second session to January 23rd, that was an intra-session recess of the Congress that we're looking at during that period. And that was a period in which no business was conducted. In fact, the pro forma sessions were used to ensure that no business would be conducted. And on January 4th there was not even a pro forma session. This was a day which there was absolutely no indication. And here we have an agreement that that was a period of time in which the Senate was not available to provide advice and consent. So this isn't a case where every meat and bound of the limit of an intra-session recess has to be determined. I think that the court should not and need not. I think it's something that the political branches have agreed to for almost 100 years. And it has not created a problem that the employers are trying to create. Now that this genie is out of the bottle, whether or not the political branches agree, it seems that if we adopt the government's interpretation, anytime there is an intra-session recess appointment of some controversial duration, there's going to be litigation. No, Your Honor, we don't think so. There have been more than 400 intra-session recess appointments. Well, that's the history, but now you're here. Now they're here. But in addition, Your Honor – Why wouldn't an employer or any other party who was dissatisfied with the results of a particular agency action, and in particular a recess appointee, raise this issue in every case? Because they would be wrong, Your Honor. I can also point to the congressional acquiescence. Congress enacted the Pay Act, which provides for payment for recess appointees, but it says if there is an appointment to a vacancy that existed while the Senate was in session, we are going to defer payment on that until after that person is confirmed, and then there's some exceptions. The Comptroller General, an official of the legislature, has confirmed in a 1948 opinion that that statute pays appointees who would be appointed in violation of the employer's views of both the intra-session and the happen argument. The Senate is not here with an amicus brief saying that they agree with this. There is no resolution by the Senate agreeing with this. Their own enactment of the Pay Act confirms their recognition of the authority of the President, their acquiescence in appointments under both the intra-session and the happen view here. So we urge you to look at that. But this is not an amicus in Noel Canning. No, Your Honor. I'd like to be very clear. Many Senators did, but Judge Griffith, himself a former Senate legal counsel, pointed out to counsel for those Senators it was not the Senate quod Senate. Right. The Senate has a procedure where they have to vote to have their legal counsel file a brief, so that brief does not represent the views of the Senate. I'm sorry. I must have misunderstood what you said. I apologize. Tell me, is it your view that the Senate picks the relevant period to consider whether or not an intra-session is available for a recess appointment, whether it's a recess for purposes of the recess appointment? Is it the Senate's determination? I think that the issue isn't presented here because there is an agreement that there was no business conducted during this entire period as a matter of threshold. I just got through telling you what business was conducted during this period. No, there was no business conducted during this 20-day period, Your Honor. And I would appreciate it if you would answer my question. Yes. As I mentioned to Judge Hamilton before, we do think that there is some deference due to the President as an enumerated power here under the Constitution. To determine when the Senate is in session? Well, he can't be made to guess. He needs to be able to know when he can exercise his enumerated power. And when the Senate tells him that they are doing no business for 30 days, that is within his authority to act. Yes. So we do think there is some deference accorded to the President, Your Honor. I would also like – Let me ask you another question. The Board never states how short a break is too short under its theory to serve as a recess for purposes of the Recess Appointment Clause. Suppose that the majority leader of the Senate decided that they were going to go to a – whatever you want to call it – down at Williamsburg for the weekend to include Friday and Monday. Would that be a recess? It would be a recess, but would it be the recess, which is the way the Constitution describes it? And the recess, Your Honor, doesn't specifically refer to simply one intercession recess. Even the first Congress had three sessions. So even in its word, that Noel Canning interpretation, doesn't identify one even intercession recess. There was more than one intercession there. But to go directly to your answer, Your Honor, here again it's 20 days. No one thinks 20 days. Certainly the Executive has never urged that the lunch break, the de minimis break, would be something that triggered the Recess Appointment Clause. However, if the Court were to think that there was – that we have pointed out on a footnote here that this is not – even if there was some substance to the pro forma sessions, which we don't think there was, this would not be the type of three-day recess between working sessions. This was a period over the better part of a month where there was no business to be conducted by the Senate. Wasn't the Senate called to order every third day? There was one Senate that gaveled in for less than 60 seconds. There was no prayer. There was no Pledge of Allegiance. There was no debate. There was no speech or debate. There was no duty of attendance. And that is what the Senate report and the Attorney General opinion for a century have relied upon. I suppose under the Boas theory, advice and consent of the Senate is irrelevant under these circumstances. Under the Recess Appointment Clause, but it's very important, Your Honor, this is only a temporary appointment. That is the structure that the framers put together. It's just a temporary appointment to carry out the very important role that these offices be filled and the machinery of government continue. So when there's some long period, the government can continue in that just because some vacancy arose during a session, perhaps it doesn't have to wait to be filled. I'm running out of time. I want to address the happens argument, but I do want to clear up one factual thing, too, the suggestion that the President was trying to wait to the last minute or something. Just to be clear, Your Honor, you asked about Member Flynn. He had been nominated in January 2011, as you pointed out. That nomination was pending for a year, and the Senate had not acted on it. In addition, there was a second nomination pending for a longer period. Member Beckert had been nominated in April 2010. His nomination did not act on it. He was also re-nominated in January 2011, so his was pending for a year as well. Could I ask you the same question I asked Mr. Haslund, and that is about the President underlying this notion of a presumption of presidential action as opposed to any other branch of government? I think it's all branches of your government, Your Honor. There is a presumption that federal officials actually act consistently, and the President takes an oath to uphold the Constitution. And do we all. Exactly. I think that's yon perventure. And I have to say, also, for example, the employer's brief suggests that even President Washington was somehow trying to game the system on the happens argument. That wasn't my question. But there's no evidence to support that is what I'm saying as you read through that. I don't disagree. My question was just about the presumption. Yes, we think there is a presumption of regularity of upholding the oath that the President has taken. But not as distinguished from any other constitutional officer. No, Your Honor. I would like, if I could, just to take... Let me ask you one follow-up question on that. If we applied the Board's presumption of regularity, wouldn't that usurp the Senate's authority to implement its own procedural rules and flout the concept of checks and balances embodied in the United States Constitution? We're not urging you to adopt any presumption of regularity, Your Honor, at all. We're basing it on the text of the Constitution, its history, and the purpose of the Recess Appointments Clause. The Board's opinion may have looked to that as an agency, but this is obviously an Article III court that we are looking to... You're abandoning any argument with respect to the presumption of regularity? I think that's different than the presumption that the President acts consistent with his oath to uphold the Constitution and also the deference to some degree that would be given to the President in interpreting his enumerated authority under the Recess Appointments Clause. That we're not giving him. I think that the Board's presumption of regularity is a different thing than as a federal agency it was adopting. If I could just turn to the happens argument for a moment, that employers argue that the President's authority should be limited to making appointments to vacancies only if they arose during the same vacancy and they rely on an initial Attorney General opinion that was given to President Washington. But as we point out in our brief, even President Washington did not act consistently with that when he appointed the U.S. Attorney in Kentucky and the first engraver. There's a line of Attorney General opinions after that. Indeed, one of them was to President Lincoln. He appointed a justice to the Supreme Court that would have not complied with the employer's interpretation, Noel Canning's interpretation there. Let me ask you this question, which you probably don't want to mention, but what effect does a Noel Canning case have on this particular case? Is it only applicable to D.C.? Yes, Your Honor, it's an opinion of the D.C. Circuit. So every circuit would have to rule on this? Well, Your Honor, three circuits have already ruled on the happens argument, all in our favor. The 2nd Circuit, the 9th Circuit and Bank, and the 11th Circuit and Bank. Noel Canning put itself into conflict with all three of those circuits. And in addition, on the intercession argument, the 11th Circuit, sitting in Bank, had already decided this issue, agreeing with our interpretation of history and the text, including things like the use of the, the singular. Has the Board sought certiorari to the Supreme Court in a Noel Canning case? The Board has announced that it will be seeking certiorari, Your Honor. The current due date for a petition is April 25th, and that was announced on the date, or the day after, I think, that otherwise in Bank would have been sought in the D.C. Circuit. Thank you, Your Honor. Thank you very much. Mr. Seid. Good morning, Your Honor. May it please the Court, David Seid for the Labor Board. I will be addressing Enterprises' refusal to bargain with the Union. And in my limited time, I wanted to address a few points raised by Enterprises' counsel. First, with respect to the use of the photograph, contrary to counsel's suggestion, an employer and a union have the same heavy burden before the Board of showing that an impropriety occurred that prevented a fair election. That does not change whether the conduct is by the employer or the union. Here, as employer's counsel recognized, despite its burden before the Board, Enterprises never called the employee's photograph was used as a witness. In that context, as the Board reasonably explained, there is no evidence that the employee opposed the union, no evidence that the employee opposed the use of the photograph on the flyer. And in that context, at most, there is a misrepresentation to other employees that the employee had given his approval for the photograph to be used. For that reason, the Board applied the Midland test, which Enterprises recognized would not be a valid basis for overturning the election. There is no double standard. Enterprise has not cited to, nor is Board counsel aware of any similar case involving an employer that had apparently an inadvertent use of a photograph. So under your view of the case, if the employer had committed the same act with no evidence that the employee was offended or otherwise misrepresented with respect to his intentions as to unionization, same result? Your Honor, I cannot speak for how the Board would decide that case, but it would have to consider on those facts whether there would be different policies for the employer's use of a photograph because under the Allegheny Ludlum case, there are concerns by the Board that videotaping or photographing of employees could constitute unlawful polling, which are not concerns that a union needs to be addressing. So in that context, the Board would have to determine whether on that limited, isolated situation, there would be a concern about unlawful polling. And that was the case in Media General. I was just thinking, in fairness to the Board, we have recognized the difference in coercive potential between the union and an employer. That is correct. In the Media General and cited in the Board's brief, this Court very specifically did recognize that there are different issues when it comes to coercion about photographing or videotaping of employees by an employer versus a union. And with respect to the weather, the Board reasonably found that the weather conditions did not prevent a fair election or deny employees an opportunity to vote. As Judge Diaz noted, the employer did not raise any concerns at the time that the balloting started, and this was a weather event that had occurred early that morning. And then the following day, whatever concerns that there might have been about the weather, the evidence does show that any delays for surrounding schools or government agencies were very limited. The polling was not conducted until late morning and then again in the afternoon, giving employees an ample time to vote. And unless this Court has any further questions, the Board would simply ask that this Court enforce the Board's order and direct Enterprise to bargain with the union. Thank you very much, Mr. Seid. Mr. Englehart? Thank you, Your Honor. My name is Robert Englehart. I represent the National Labor Relations Board in the Huntington-Engels case on the labor law issue. First, I'd like to emphasize that the Board's decision in this case analyzed the appropriate unit under two different theories. The first one would be the specialty health care analysis. The second one would be the technical occupation line of cases, TRW. The Court need not reach the specialty issue, and in fact, it should not, for two reasons. First, the employer has never challenged the application or the specialty standard before the Board in this case. That's a requirement under Section 10E of the National Labor Relations Act that an objection first be raised to the Board before the Court has jurisdiction to entertain it. That has not happened with regard to the specialty analysis. But the second point is contained within the own, even if the Court were to consider it, within the Board's own decision. Before it goes to the separate TRW analysis, it indicates that even under specialty, and I think you'll find that under footnote 29, specialty is not designed to alter special occupation or industry rules. The Board then proceeded in this case to apply that existing line of technical employee rules, while also building in some doubt going forward whether those rules would be the same as technical employees and the diversity of the industries and their occupations change.  Within that TRW line of cases, while there was a presumption that an all-technical employee unit was appropriate, there were also exceptions. And I would note two specific exceptions, both in the New Orleans public service case, which is discussed at footnote 13 of the Board's decision, and also Martin Marietta. And both of those rely on the functional separateness of the technical employees. Mr. Engelbart-Hart, could you clarify something for me? You said that the court should not reach the specialty issue? Yes, I did. You mean the specialty health care? Yes, I did. Because they didn't raise it before the Board? Yes, I did. I thought specialty health care was decided after the hearing in this case. Yes, it was, Your Honor. And the Board's position is that they... Well, how could they... Okay. How could they have raised it? They had a motion for reconsideration available to them. After the instant decision, specialty obviously had already been decided because the Board discussed it. They could have moved the Board to reconsider its decision, arguing why specialty was either wrongly decided or wrongly applied. So it's your position that they waived it by not moving for reconsideration? Yes. In this case, while a motion for reconsideration is not required to argue before the court initiated... And that was going to be my point. Yes. It's not required, but you have to have raised that particular objection before the Board in some context. And if you've never raised it earlier and it's your first opportunity, then in that context, a motion for reconsideration at least preserves your right to continue to press that issue. So it's a preservation of areas? Yes. But turning to the TRW line of cases, I want to mention that there are... The two key cases I mentioned build in separate units when there is a functional separateness. And that's what we have in this case. And it's very different from the Westinghouse cases used by the employer to argue that the Board incorrectly found this unit appropriate. In determining an appropriate unit, we don't just look to the jobs. The job may be the same as in Westinghouse, but we look to the employer's operation and how those jobs are integrated in the workplace. In Westinghouse, we had all the technical folks working with nuclear radioactive material. Westinghouse was one-tenth the size of our technical employee situation in hunting. And all the radiological control technician folks in Westinghouse were at some point involved, integrated with in the same department, the same supervision as the other technical employees. So in that case, they were found to be in an overall unit. Here we have a very different set of facts. We have the technical employees that the Board found in the E85 RADCON unit functionally dedicated to radiological control and oversight. One of the most important things that I think Judge Duncan indicated at the very beginning is that the Board did not just take the unit that the union petitioned for. It expanded the unit by about 40%, which is a significant percentage, to include that entire function. And the reason that function is so separate in this workplace is because we have a shipbuilder who only exposes various folks to nuclear materials at the end of the construction process so that a ship could take six years in construction, and it's the last few months that those folks may be involved in interacting with the radiological control area. Our radiological control technicians and that function in the E85 RADCON department are under separate supervision. They're a separate department. They have specialized training. They go through a 22-week course that the other technical employees don't, and only 50% of them even pass that course. They are working on board and don't have set offices the way the other technical employees in large measure do. Not all of them, but designers, for example, all have separate offices in which they work. Their interaction with the other technical employees is limited to when those folks are wanting to cross into a radiological control area, and that's arguably no different from when other tradespeople cross. And one point that was brought up before is that the board is aware that there is not an alignment of interests when you have the radiological control people being able to tell the other technical employees they can't cross into an area, their work has to stop. They're exercising that function here. This is just a very, very different employer from Westinghouse, and it's on that basis that the board reached a different result. And in this whole area of bargaining unit determination, this court in Sandvik and in Arcadian has emphasized that unless the unit that the board has chosen is utterly inappropriate, it should be deferred to by the court. And I would submit that there is nothing inappropriate about the unit the board's chosen here. It's consistent with the TRW line of cases. Where does the overwhelming community of interest analysis then, where do you inject that in this process? The overwhelming community of interest analysis really isn't part of the TRW line of cases. It was the final step in the analysis under the specialty health care where first the board determines a community of interest identity among the unit being analyzed, and then asks whether having found a community of interest, are there other folks out there that the employer urges have no separate legal, have no separate identity other than with the requested or the arguably unit that's being found appropriate. So it's the final step in that.  While you see that phrasing in accretion cases, in that setting when a group of employees is found to have an overwhelming community of interest, they are accreted to an existing unit without a vote, and that's not a desired result. As the final step in the specialty analysis, when that question is asked and answered, those folks will have a vote. Either they will be brought into the unit and then they'll have a vote at that moment, or they won't and their future will be theirs to figure out in subsequent efforts to either organize or not organize. But there's no boxing them out of a vote. The employer says that this analysis by the board was patently inconsistent with our holding in Lundy. How do you respond to that? Well, I think that the court identified two failings of the board in Lundy, neither of which exists in this case. The first failing is that the court viewed the board as not having done a rigorous community of interest analysis and just accepted the unit that the union came in with. Here we had a two-day hearing by the regional director on all of the community of interest factors, an employee, a hearing officer within the region. And the regional director, you can see that at page 399 to 402 of the joint appendix, said that wasn't even enough and had a subsequent hearing of three more days where all of the focus was on the distinction between these radiological control employee groups and the other technical employees. So the first answer is that we have had a very rigorous community of interest analysis in this case, which was lacking in Lundy. And the second more general point, at the end of Lundy, and it's an aspect of the case that's often perhaps not talked about, even there the court was recognizing that with sufficient explication by the board and a studied analysis, the court would give the board more deference if it found its reasoning reasoned, if you will. And both in the specialty health care decision underlying this and in the Huntington decision before you, we would submit that it's a very thorough and very open and careful analysis by the board of the unit. Thank you, Your Honor. Mr. Koppus. May it please the court, my name is Jim Koppus and I'm representing the union on the Huntington Ingalls case. I was going to make points about the labor law issues, but Mr. Engelhardt basically covered everything that I would have had to say. I just would like to reiterate that this was a very diligent, careful analysis on the part of the regional director and the board under the technical employee line of cases. And the employer's only response to that is to argue that that line of cases stands for a categorical inclusion of all technical employees in the unit no matter what, and that's simply not the case as the DRW, the decision by the board on which they rely, shows. With respect to the recess appointment issue, I just wanted to point out two factual matters that I thought were pertinent to the court's questions. One is that the resolution under which the Senate was operating during the period in question was the unanimous consent resolution restricting them from doing any business. And that's actually more binding and restrictive than the typical recess motion because it required the consent of every single senator before the Senate would be able to take up any business. And that's what occurred on the one day that they passed legislation. Under a normal recess resolution during a session, the majority leader can call the Senate back in session by himself without unanimous consent. The other thing that flows from that unanimous consent resolution is that there won't be any quorum calls during that period because under the Senate rules, a quorum call can only be made when business has been conducted since the last quorum call. So the senators are reassured that without their individual consent, they won't have any duty to attend, and indeed none of them did attend. The second factual matter I'd like to point out is that the inter-session interpretation that the employers argue for is the same sort of mechanical interpretation that the Senate resoundingly rejected in 1905. What happened in that instance was that President Roosevelt in 1903 had said, between sessions of Congress, no matter what, I get to make appointments. And there was an instantaneous break between the two sessions in which he appointed 160 officers. And the Senate recoiled at that and said, we're going to undertake a systematic interpretation of what we think a recess is. And the 1905 report was a result of that. Under the interpretation that the company is now putting forward and the D.C. Circuit embraced, a very short break between sessions would allow the president to make appointments. And in this instance, the House, for example, between the first and second session of the 112th Congress took a one-hour break. The Senate didn't, but the House took a one-hour break. Under their interpretation, the president during that one hour, because it was an inter-session break, could have made all these appointments. So you see, the choice is an untenable mechanical interpretation or exercising judgment as to whether the Senate is there or not. And what the executive, the Senate, and every court prior to the D.C. Circuit have struck upon as a practical interpretation. Who would exercise that judgment, in your view? Well, I think that the president has to initially, because he's making the appointments, but I think there probably would be some matter of review by the other branches. The Senate certainly has lots of political responses as it takes, you know, as it's done in the Pay Act. If it thinks that this is an overreach, I suppose at the end of the day, a court, if it was a ridiculous interpretation, could come in. But the consistent interpretation of the executive branch and the legislative branch in every court prior to the D.C. Well, the D.C. Circuit actually didn't reach this issue as to who would make the judgment. But I think everybody has taken the position that the president probably gets the nod because he's the person that has to execute the laws and has to make the appointment. Thank you very much. Thank you. Regent. Thank you, Your Honor. I know I have to be very brief. With respect to Mr. Seed's argument with respect regarding the photograph of the employee and the lack of consent, he properly notes that employers have limits on whether they can poll employees as to their union sympathies. Frankly, on the other hand, he's suggesting that we should have polled that precise employee, called him as a witness,  for or against the union, which I think is exactly why we can't engage in that. But more importantly, the board in London Allegheny noted that the employee has the right to determine the degree to which he or she wishes to express support. That wasn't provided here. The employee did not give consent. The union failed to follow its own rules with respect to its policy. How do you know he hadn't acquiesced in the use of his photograph? Because the union presented no evidence of that. The union said that their policy was to get consent forms. The union acknowledged the testimony of a witness that... Well, it would be a lot better if he had his testimony, wouldn't it? Would have been, but then we would have been interrogating the gentleman. All right. The union stipulated, Your Honor, that they did not get the consent of this individual. And that's in the record. Thank you. Thank you very much. Your Honor, Greg Robertson again on the Huntington labor issues. It's amazing how fast the NLRB is running away from specialty. In this case, they said specialty was the law that applied. Take them at their word. It is the law that applies. Your Honor, as to the point about the additional people added to the unit, one, it wasn't 40 percent. It's like 13. Two, it was done with the agreement at the union at the hearing. And three, the footnote in Lundy that applies from Judge Wilkinson is, the sole question before the court is whether the board gave controlling weight to union organization with regard to the exclusion of certain people. He said earlier that because the union never brought the issue up to the board, the question, the unit before the board, the unit before the court, is the one that came out of the hearing below. The board didn't add anybody to anything. That's plain and simple. The board's analysis under specialty added nobody to anything. The union agreed way down at the hearing officer level. As to the question of functional integration, I urge you to read the testimony of Wolkovich, Glenn Morgan, and others. The record is replete with testimony that was ignored. But how do you decide that Westinghouse is distinguishable from Huntington if you don't even mention the testimony of the one witness who worked at both places and testified in an uncontradicted way that what they did was the same thing? And finally, I would say that it is ironic indeed that the labor board comes up and tells us two years that they applied a new standard to us, two years after the record was closed, and somehow or another we waived the right to argue about it. That is an astounding conclusion. But I would leave the court with this. Lundy is the case that is on all fours. This case was decided under the specialty case. It was not really decided under TRW. That's an afterthought. That is, as you could hear from argument, a way to try to have it both ways, to slip specialty under the Fourth Circuit's doormat and under the Lundy doormat so that they can keep going with it out into the future. That's the case that this court needs to focus on from a labor standpoint as well as Lundy. Thank you. Mr. Schabelsky? Your Honor, I would like to answer three questions, important questions you asked the board so you have the benefit of the employer's views on that. You asked about, according to the President, presumption. I would refer, Your Honors, to two cases. The first is Dames and Moore v. Regan at 453 U.S. 654, 1984. There the Supreme Court made clear that the President has a presumption when he acts pursuant to an express or implied authorization from Congress because there he's acting jointly with his power and delegated power from Congress. But when he acts without congressional authorization, indeed at odds with Congress's power, especially in the separation of powers area, that is when his power is at its, quote, lowest ebb, and he is not entitled to a presumption. And then in the Freitag case, Commissioner of Internal Revenue Freitag cited in our cases, there specifically in the context of the appointment power, the Supreme Court rejected the argument that it should defer to the executive's view that an executive action did not encroach upon the appointment of powers. There is no presumption here. This court would have to decide this without according either branch a presumption. Second, you ask the board about what standard applies under their test. We never heard an answer. What factors are relevant? Where do those factors come from? How do we weigh them? The board can't even be consistent. Under their view, this appointment was made on January 4th. You'd have to wait until January 23rd, look retrospectively to see what happened. It would be chaos. They are not even consistent. In their opening brief, in their response brief, they told us a three-day break would be sufficient. Mr. Schabelsky, you reserve one minute for rebuttal. Do you want to wrap up? Yes, Your Honor. These are real sessions. The Congressional Research Service told us these are real sessions. And if you apply the test that Noel Canning did on the intercession, no one has to decide these murky issues. It's an easy rule for the courts to apply. Thank you, Your Honor. Thank you. Thank you. I'll be brief. I have two points to make. First, the government stated that this is a problem that does not exist. They indicated that, in their mind, the Senate and the executive agree on this issue. I would submit that that is not the case. Everyone acknowledges that intercession appointments really began under the Reagan administration. They are a recent advent of our times, and so is the Senate's use of the pro forma sessions. I believe that they used those precisely because they felt their constitutional power and their constitutional role to provide advice and consent was being eroded by the recent use by the President of intercession appointments. Secondly, the government stated the President can't be made to guess when the Senate is in the recess, and we couldn't agree more. And that is why the intercession is the proper way to rule on this, because then no one has to guess. Thank you. Thank you very much. We will come down Greek Council and take a brief recess.
judges: Allyson K. Duncan, Albert Diaz, Clyde H. Hamilton